## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MOUNTAIN PRODUCTIONS, INC.,  :
            :
    **Plaintiff,**    :
  v.         :  **3:22-CV-01588**
            :  **(JUDGE MARIANI)**
DAVID PICCOLA, ADAM CRAIN,  and :
CHRISTINE CRAIG,     :
            :
    **Defendants.**   :

### MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court is Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction against Defendant David Piccola. (Doc. 4.)

On October 11, 2022, Plaintiff Mountain Productions, Inc. filed a Complaint against three of its former employees: Christine Craig, Adam Crain, and David Piccola. (Doc. 1.) The Complaint asserts sixteen causes of action.[1] On October 14, 2022, Plaintiff filed a Motion for a Temporary Restraining Order and Preliminary Injunction against only one Defendant, Piccola. (Doc. 4.) Plaintiff thereafter filed a brief in support of the motion, (Doc.

_____

[1] The present Motion focuses the Court's attention on only three claims: breach of contract, conversion, and violation of the Pennsylvania Uniform Trade Secrets Act. (Doc. 1.) However, the causes of action the Court does not address in this Memorandum Opinion are either claims for which Plaintiff has an adequate remedy at law or are subsumed within the causes of action to which this Opinion applies.

Plaintiff asserts its fifteenth cause of action under the Defend Trade Secrets Act, 18 U.S.C. § 1386(b). Therefore, federal question jurisdiction is proper under 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331, and the Court exercises supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5), to which Piccola filed no brief in response. On October 24, 2022, the Court issued a

Temporary Restraining Order ("TRO") pending an evidentiary hearing, (Doc. 16), and

extended the Order on November 8, 2022, through November 21, 2022. (Doc. 20.) The

TRO stated, in pertinent part,

    a. Defendant Piccola is **ENJOINED** from violating or otherwise acting in derogation of the December 2020, Confidentiality, Intellectual Property Assignment, Covenant Not to Compete and Not to Solicit and Release Agreement ("Piccola Agreement") through any of the following actions:
        i. violating § 2 of the Piccola Agreement by using, permitting the use of, disclosing, or making available any "Confidential Information" as that term is defined in the Piccola Agreement;
        ii. violating § 4 of the Piccola Agreement by exercising any rights over any of the Company's "Intellectual Property" as that term is defined in the Piccola Agreement;
        iii. violating § 5 of the Piccola Agreement by directly or indirectly competing with Mountain Production, Inc.'s ("Plaintiff" or "Company") within the Territory as that term is defined in the Piccola Agreement;
        iv. violating § 6(a) of the Piccola Agreement by soliciting any of the Company's current or former customers to provide any order for goods or services competitive to those provided or sold by the Company;
        v. violating § 6(c) of the Piccola Agreement by directly or indirectly soliciting any of the Company's current or former employees for employment or to leave his/her employment;
        vi. violating § 7 of the Piccola Agreement by saying, writing, or causing to be said or written any negative, derogatory, or disparaging statement about the Company or any of its officers or employees or inducing others to do so in any forum.
    b. Defendant Piccola is **ENJOINED** from directly or indirectly disclosing, using for his own benefit or the benefit of others, accessing, or transferring Plaintiff's Confidential Information or Intellectual Property;
    c. Defendant Piccola is **ENJOINED** from directly or indirectly using Plaintiff's Confidential Information or Trade Secrets to solicit the Company's current and prospective customers including, but not limited to, Undisclosed Customers 1-4;

    d. Defendant Piccola is **ENJOINED** from destroying material relevant to the subject matter of this lawsuit, whether in hard copy or electronic format, including but not limited to, paper copies of documents or any electronically stored information ("ESI") or other data generated by and/or stored on any and all computer systems and storage media, or any other electronic data within Defendant's possession, custody, or control, which may be relevant to this potential action.

(Doc. 16 at 2–4.)[2]

    The Court held an evidentiary hearing on Plaintiff's Motion on November 18, 2022. Plaintiff's Motion having been fully briefed and a preliminary injunction hearing having been held, the Motion is now ripe for disposition. For the reasons that follow, Plaintiff's Motion for preliminary injunctive relief will be granted in part and denied in part as set forth in this Memorandum Opinion and the accompanying Order.

## II. FINDINGS OF FACT

1. Ricky Rose is the current Chief Executive Officer of Mountain Productions, Inc. (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 13.)

2. Rose testified that Mountain Productions, Inc. is "known as a premier staging company and rigging company across the United States and throughout Europe." (*Id.* at 15.) Plaintiff has an "installation side" of its business which handles "staging installations" and involves "designing [and] engineering[] rigging components, and

---

[2] The Order, (Doc. 16), is substantially reflective of the relief Plaintiff requested in its Motion. (Doc. 4.) Plaintiff has not asked the Court to modify the Order—only to extend its application through the course of the litigation. (*See* Doc. 5.)

fabricating them and then installing them in professional sports arenas and venues, theaters, [and] houses of worship." (*Id.* at 15–16.)

3. Plaintiff serves customers located "coast to coast" and "in 38 other countries." (*Id.* at 16.)

4. Piccola "started in entertainment rigging in 1986." (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 103.) He has performed rigging installations for numerous companies, including Atlanta Rigging Systems. (*Id.* at 105.) At one point, Piccola ran his own company, Upstate Fall Arrest and Rigging. (*Id.*)

5. Having worked in the rigging industry since 1986, Piccola has many contacts at various companies in the industry. (*See id.* at 113.)

6. Piccola was hired as the Director of Venue Operations at Mountain Productions, Inc. in December 2015. (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 16.) Rose testified that Piccola's duties in that role "were to manage strategy within the [Installs] department, manage our customer relationships, manage our on-the-road teams that would actually go in and do the installs, build out pricing and our proprietary pricing models, and manage the overall division that we have put a lot of effort in to grow." (*Id.*)

7. Some employees in Plaintiff's Installs Department, including Defendant Adam Crain, worked with Piccola prior to his job with Plaintiff. (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 116.) Piccola testified that he and Crain have "been together for 15 years." (*Id.*)

8. At some point during his employment, Plaintiff issued Piccola a company phone, iPad, and computer. (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 50.)

9. In December 2020, Piccola was promoted to Vice President of Venue Installations. (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 17.) With that promotion, he had "more managerial responsibility and access to more information." (*Id.*)

10. Rose testified that in this role, Piccola had access to

    pricing models, proprietary pricing models that were developed in-house, he was exposed to design renderings and proprietary proposals that we put forth in front of clients, he was exposed to CAD drawings, [and] he was exposed to patentable information[] . . . . He was exposed to everything short of our financial statements. Quickbooks, all of our customer lists, Knowify[] . . . ."

    (*Id.* at 60.) Rose also testified that Piccola had access to "the company's trade secrets," "marketing and sales strategies," "information regarding customer accounts," "billing methods," and "customer ordering patterns." (*Id.* at 61.)

11. Piccola testified that the information he had access to did not constitute confidential information or trade secrets. (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 128–32.) He testified that he created and used the pricing models before Plaintiff hired him. (*Id.* at 129.) He testified that the "rigging designs" . . . "were based on drawings [Crain and Piccola] had from jobs when we were at Atlanta Rigging Systems . . . all they did was duplicate drawings they had done for Atlanta Rigging Systems and superimpose them on this new set, and we used them for that job." (*Id.* at 130.) With respect to the confidentiality of "billing and customer ordering patterns, Piccola testified, "It's pretty

safe to say I'm not the first person to ever bill a customer." (*Id.* at 132.) He added

that "the billing model was built by the American Institute of Architects." (*Id.*)

12. Policy 610 of Plaintiff's Employee Policy Handbook provides for the protection of

Plaintiff's confidential information. (Hr'g Ex. P-8.)

13. On December 23, 2020, Piccola signed a "Confidentiality, Intellectual Property

Assignment, Covenant Not to Compete and Not to Solicit and Release Agreement"

(the "Agreement"). (Hr'g Ex. P-6.)

14. The Agreement provides that Plaintiff would pay Piccola a lump sum payment of

$5,000 in exchange for signing the Agreement. (*Id.* at 1.) Plaintiff did in fact pay

Piccola the agreed-upon amount. (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 47.)

15. The Agreement includes several restrictive covenants. First, the Agreement prohibits

Piccola from using or disclosing to any third party any "Confidential Information" for

any purpose except the performance of his job. (Hr'g Ex. P-6 at 2.) It further requires

that Piccola "immediately deliver to [Plaintiff] all materials containing Confidential

Information" upon termination. (*Id.*) "Confidential Information" includes

> all information relating or pertaining to designs, findings, products, inventions,
> displays, sets, sketches, drawings, plans, artist renderings, copies,
> photographs, reproductions, operations, method of operations, purposes,
> discoveries, equipment, samples, improvements, specifications, processes,
> marketing or promotion of products, know how, pricing, markup rates, test
> and other data, services, selling agreements, suppliers, customers, former
> customers, current or former customer information and/or lists, vendors,
> suppliers, former vendors and/or suppliers, current or former vendor and/or
> supplier information and/or lists, subcontractors, customer preferences,
> customer ordering patterns, secret processes, technical data, descriptions,

formulas, budgets, projections, reports, research and development, studies, contracts, client lists, software, source code, business policies or practices, the identity, skills, and compensation of employees, contractors, and consultants, all objects, employee specialized training, documents and other materials which contain or otherwise reflect such information, whether marked confidential or not.

(*Id.* at 1.)

16. The Agreement also provides that Piccola "assign[s] to [Plaintiff] all of Employee's right, title, and interest in and to any" of its "Intellectual Property," as defined in the Agreement.[3] (*Id.* at 3.)

17. The Agreement prohibits Piccola from competing with Plaintiff for a period of one year following the termination of his employment with the Company. (*Id.* at 4.) Specifically, Piccola

shall not, directly or indirectly, as principal, owner, agent, employer, employee, manager, operator, consultant, shareholder or otherwise, engage, control or be interested in any entity, its successors, assigns, affiliates and related entities, within the "Territory" (as defined below), whether for profit or nonprofit, which is or are in any business or activity that is in competition with

---

[3] "Intellectual Property" includes

all inventions (whether patentable or not), creations, discoveries, concepts, ideas, findings, developments, materials, processes, algorithms; trademarks, service marks, copyrights, technology, computer software and programs (source and object code), works of authorship, formulas, literary and artistic works, trade secrets, disclosures, patent applications, patents, machines, molds, assemblies, improvements, descriptive literature, data, advertising, recordings, test data, drawings, designs, shop drawings, renderings, schematics, layouts, compilations, compositions, methods, devices, machines, manufacture, formulas, techniques, products, prototypes, symbols, names, images used in commerce, as well as improvements thereof and rights, claims or know-how related thereto.

(Hr'g Ex. P-6 at 4.)

any products, services or business activities of the Company (or any of its subsidiary and affiliated companies), including, but not limited to the rental, design, manufacturing, product design, construction, sales, service, installation and distribution of staging, rigging, temporary structures, accessory dwelling units (ADU), venue installation, disaster and medical relief structures, services and products, and industrial installation of products and services (including, but not limited to, related competitive products and services for staging, temporary and permanent structures, design and engineering, internal engineering, software development, virtual and augmented reality, product development, production rigging, corporate production and activations, scenic work, film production and development, sports production, entertainment distribution, industrial distribution, E-commerce, and any areas within the scope of the venue installations department, industrial and commercial installations, and construction work. *(see also* www.mounta1nproductions.com, shopmtn.com; shopmtn.eu, roe-off.com, mtnemergencyservices.com))) [sic]. For purposes of this Agreement, "Territory" shall mean anywhere in the United States of America, Latin America, Europe, and/or Canada that the Company engages in business. Notwithstanding anything herein contained to the contrary, Territory shall not include any location within the state of California. Employee agrees that the restraint imposed under this Section 5(a) is reasonable and not unduly harsh or oppressive and that the Territory accurately reflects the geographic scope of Company's present and contemplated markets.

(*Id.* at 4–5.)

18. The Agreement also prohibits Piccola from soliciting Plaintiff's customers, vendors, and employees. (*Id.* at 5.) With respect to Plaintiff's customers, Piccola shall not "solicit or accept from any customer any orders for goods or services competitive to those provided or sold by Company."[4] (*Id.*) Piccola shall not "induce or attempt to

---

[4] Competitive goods or services include the

rental, design, manufacturing, product design, construction, sales, service, installation .and distribution of staging, rigging, temporary structures, accessory dwelling units (ADU}, venue installation, disaster and medical relief structures, services and products, and industrial installation of products and services (including, but not limited to, related

induce any customer to reduce such customer's patronage with" Plaintiff, nor shall

Piccola "otherwise interfere with the business or accounts of the Company or

derogate or defame the Company." (*Id.* at 6.) This term also applies for one year.

(*Id.*)

19. With respect to Plaintiff's employees, for one year after the termination of his

employment, Piccola

shall not, directly or indirectly, solicit or recruit any employee of Company ( or any of its subsidiary and affiliated companies) for any employment, consulting or other kind of work with Employee or any other entity, nor will Employee in any way encourage any such employee of Company, or any of its subsidiary and affiliated companies, to leave his/her employment.

(*Id.* at 7.)

20. Finally, the Agreement contains a Non-Disparagement clause. (*Id.*) Under this

provision, Piccola

agrees that [he] will not say, write or cause to be said or written, any negative, defamatory, derogatory or disparaging statement about the Company or any of its officers or employees or encourage or induce others to do so, in any forum or setting, public or private, by any means, including but not limited to Internet blogs, social media sites (such as Twitter, Facebook and LinkedIn) or any other kind of electronic communication, or engage in any conduct, directly or indirectly, that would otherwise interfere with or jeopardize the business

---

competitive products and services for staging, temporary and permanent structures, design and engineering, internal engineering, software development, virtual and augmented reality, product development, production rigging, corporate production and activations, scenic work, film production and development, sports production, entertainment distribution, industrial distribution, E-commerce, and any areas within the scope of the venue installations department, industrial and commercial installations, and related construction work. (*see also* www.mountainproductions.com, shopmtn.com, shopmtn.eu, roe-off.com, mtnemergencyservices.com).

(Hr'g Ex. P-6 at 5–6.)

opportunities of the Company and its officers or their respective operations and/or reputations.

(*Id.*)

21. During August of 2022, Piccola and other employees in Plaintiff's Installs Department were working on a job site for a project in Las Vegas. (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 23–24.) Plaintiff was hired as a subcontractor, by its customers Bombard and ArchKey, to work on Madison Square Garden Group's ("MSG") "Sphere" project (the "Sphere Project"). (*Id.* at 31; Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 162.) Defendants Christine Craig and Crain, both former employees of Mountain Productions, Inc., were working on-site. (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 24, 27.)

22. On August 8, 2022, Piccola sent an email to CEO Ricky Rose, Ricky's brother Ron Rose, and Plaintiff's COO Jeff Goldenberg. (*Id.* at 18–19.) In the email, Piccola raised concerns about "momentum" and "morale" and stated, "We feel like there's an adversarial relationship between [Wilkes-Barre] and the Installs Department." (Hr'g Ex. P-1.) He went on, "I fell that the best of all options is for me to put in my notice. I will finish with the [redacted] project for MTN if you'd like or I can take my leave with 30 days notice." (*Id.*)

23. Plaintiff's counsel Kevin Mulvehill responded to Piccola: "We accept your resignation, effective immediately . . . ." (Hr'g Ex. P-3 at 2.) Mulvehill reminded Piccola of his obligations under the Agreement. (*Id.*) Mulvehill specifically requested that Piccola

return all of Plaintiff's "Confidential Information and property in [his] possession" and provide written confirmation that he has done so by August 10, 2022. (*Id.* at 3.)

24. Policy 111 of Plaintiff's Employee Policy Handbook provides for the return of all Company property upon termination of employment. (Hr'g Ex. P-9.)

25. Piccola has been unemployed since August 8, 2022.[5] (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 120.)

26. Piccola retains possession of his Company-issued phone, iPad, and computer as of November 18, 2022, but he testified that his access to all of Plaintiff's cloud-based data, records, and other information was "shut off" as of August 8, 2022. (*Id.* at 126–27.)

27. Piccola posted the following statement on LinkedIn on August 8:

As of 08/08/2022 my team and I are longer [sic] associated with Mountain Productions. There's an awfully long story behind the parting but in all actuality, it's an extremely positive step in the right direction. I will keep everyone posted on where my team and I plant ourselves next.
Also, I have a new cell phone number. Please DM me for the number.

(*Id.* at 117; Hr'g Ex. P-2.)

_____

[5] Plaintiff offered a screenshot of Piccola's LinkedIn profile as evidence that Piccola is currently employed as the "Director of Rigging Services at Live Events." (*See* Hr'g Ex. P-11.) Piccola testified that he is not currently working in that role, and that he has "tried to change" his LinkedIn title but "can't." (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 158.) Piccola stated that he changed the title on LinkedIn when he "was originally made the offer" to take on that role," but that he has not in fact started in said role because "the lawyers for Live Events don't want to touch [him]" because of this Court's Temporary Restraining Order. (*Id.* at 158, 165.) The Court finds Piccola credible on this point; Plaintiff's exhibit shows, at most, that Piccola portrayed himself as employed in that role on social media, which is insufficient to establish that he was actually employed.

28. Piccola testified that he posted this because his "phone was shut off" and he wanted
to "let everybody know that we weren't coming in." (Test. of Piccola, Off. Hr'g Tr.,
Doc. 28, at 117, 118.)

29. Piccola testified that after posting on LinkedIn, he used his personal phone to call
Crain and said,

> Well, without getting into too much detail, I don't think I work for Mountain
> anymore. And the conversation, as best I can remember it, [Crain] said, What
> the fuck does that mean? I mean, I don't -- my phone doesn't work, I don't
> know, I can't even access my emails. . . . He said, That fucking idiot Ricky is
> going to run the job? I said, Apparently. He said, Well, we're not going to work
> for him. I said, Man, that's your choice.

(*Id.* at 119.) Piccola also testified generally that he did not ask anyone to quit. He
explained, "I didn't ask anybody, I didn't put a gun to anybody's head, everybody left
on their own." (*Id.* at 120.) He noted that he "had nothing to offer them," and that he
could not "compete with $3,000 to $5,000 a week," which Piccola testified the union
workers were earning on the Sphere Project. (*Id.* at 119.)

30. Later on August 8, Piccola spoke with Plaintiff's COO Jeff Goldenberg. (Test. of
Goldenberg, Off. Hr'g Tr., Doc. 28, at 85.) Goldenberg testified that Piccola told him
that "Adam Crain and Mike Ruiz were, also, by his side, you know, they're standing
with him." (*Id.* at 86–87.)

31. At the time, Michael Ruiz was a Project Manager at Mountain Productions, Inc. who
was also working on the Las Vegas project. (Test. of Rose, Off. Hr'g Tr., Doc. 28, at
27.)

32. On the evening of August 8, Goldenberg and Piccola exchanged text messages, in which Goldenberg wrote to Piccola: "need to figure out a time to get your mountain technology. iPad computer etc…" and asked for Piccola's personal email address. (Hr'g Ex. P-10.) Piccola texted him the email address and told Goldenberg, "And there will be nobody on-site tomorrow to use them." (*Id.*)

33. On August 9, 2022, Piccola did not show up to the job site, nor did Plaintiff's "core operational team in the field." (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 23–24.) Rose testified that this "inhibit[ed] us to complete our services to the client," and that he believes it was Piccola who "pull[ed] those individuals off the job site." (*Id.* at 24.)

34. That same day, Piccola and Goldenberg met in person. (Test. of Goldenberg, Off. Hr'g Tr., Doc. 28, at 90.) Goldenberg testified about their conversation:

[W]e talked about his resignation and his obligations to the company, and we talked about a lot of things. He spoke of how he felt ownership of the Installs Department, that he built the Installs Department, he brought the Installs Department there, and without him, we would have no business. He said that working with Local 720, which is [the International Alliance of Theatrical Stage Employees] out in Las Vegas, that we would get shit for staffing from them, now, that he's not on-site, and he, also, let me know that, much like when he left [Atlanta Rigging Systems], he scorched the earth for them, and he would do the same for Mountain. He, also, offered up an opportunity for him to come back with some stipulations. . . . He was looking for a 10,000-dollar payment as a nuisance fee for him to return, he was looking to report to me, only deal with Rick Rose, Sr., being Ricky's father, who is not in the company, per se. And he was, also, looking for his non-compete to be dissolved, upon completion of the work, after he came back at the Sphere project in Las Vegas.

(*Id.* at 90–91.)

13

35. Piccola admits offering these three stipulations. (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 133.) However, Piccola testified that his "scorched earth" comment was "taken out of context." (*Id.* at 137.) He stated that

> when [he] left Atlanta Rigging Systems, although, it was a relatively amicable parting, the department crumbled. . . . [Y]ou can't do what I was doing for either Atlanta Rigging Systems or Mountain without having done it, right. . . . I said the same thing is going to happen here, you can't do this.

(*Id.*) He explained that "this is a specialty trade" and without someone with relevant experience, "it's . . . not going to be successful." (*Id.*)

36. Goldenberg testified that Piccola indicated during their conversation that "he could bring the rest of the team back" if his stipulations were met. (Test. of Goldenberg, Off. Hr'g Tr., Doc. 28, at 92.)

37. Goldenberg also testified that Piccola was "angry towards the company" and referred to Ricky Rose as "that little shit." (*Id.* at 93.)

38. Piccola also told Goldenberg that "with or without Mountain, he would be back on-site the following Monday." (*Id.* at 93–94.)

39. Rose also met with Crain on August 9, 2022. (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 27.) Rose testified that Crain told him that "he walked off the job with his team" and that "sometimes things like this need to happen to get people to the table." (*Id.*)

40. Approximately one week later, Piccola texted Goldenberg a screenshot of a text message conversation between Piccola and Defendant Christine Craig. (*Id.* at 94.) The screenshot depicts the following conversation:

Craig: Have you spoken with Jason or Troy?

Craig: I'd like to see the plan you created when you have a moment.

Piccola: [sends PDF attachment labeled "Rope Access Project Manag…"]

Piccola: Please help us put that final nail in the coffin today

Craig: I told you I was waiting until tomorrow because birthday. And yeah, I know, I know.

Piccola: A lot of lives are on hold Chris.

Craig: I will be departing the job site next Wed. It is not known outside the company yet and if you lead with that, R will think /know it came [remainder of message not pictured]

(Hr'g Ex. P-5.)

Below the screenshot, Piccola sent a message to Goldenberg that reads, "Chris has been working with us this whole time." (*Id.*)

41. Goldenberg testified that he believes the PDF attachment Piccola sent to Craig in the screenshot is a "business plan." (Test. of Goldenberg, Off. Hr'g Tr., Doc. 28, at 95.) He also noted that "a lot of the work we were doing on the project in Las Vegas with the Sphere was Rope Access." (*Id.* at 97.)

42. Rose testified that he confronted Craig about the screenshot, and that Craig told him that the "thumbnail . . . on that screen shot" was "a business plan about the new install department that [Piccola] was looking to make with Mountain Productions' employees, and he had sent it to her review and give feedback on that." (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 43.)

43. Piccola testified that the PDF was not a business plan: "[T]hat's a Rope Access Project Management Plan, that's not a business plan, it says it right there." (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 146.) He explained that "all that was was me

actually helping Mountain, that was the Rope Access Action Plan, Project Management Rope Access Plan for that job, so she asked for it, and I sent it to her. . . . To help her with her job, until she got out." (*Id.* at 124.) He had created the Rope Access Plan for the Sphere Project, he explained, while he was still employed by Plaintiff "to submit to Safety, to submit to MSG, to submit to Bombard, to submit to Seely." (*Id.* at 144.)

44. Rose testified that Craig told him that "she had been, you know, soliciting employees" and that "Piccola had been involved in the solicitation." (*Id.* at 43–44.) Craig also told him that "[Piccola] was soliciting customers." (*Id.* at 44.) Rose explained that he believed the references to "Jason" and "Troy" in the text message screenshot referred to Troy Bost, who is "with ArchKey," a customer, and Jason, who was with "either Bombard or ArchKey," and that Craig said Piccola had been "in touch" with them." (*Id.* at 44–45.)

45. Piccola testified that he "didn't ask [Craig] to leave her employment, she offered— that was her idea." (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 124.) He stated that "we were as friends, as a group, we were trying to get back on that job." (*Id.* at 123.) With respect to his text message to Craig that reads, "Please help us put that final nail in the coffin today," Piccola explained that he was referring to "trying to get us back on that job." (*Id.* at 140.) Piccola explained further that when he left Mountain

Productions, Inc., he was hoping to "consult[] with MSG," but "not as it related to the

work Mountain Productions was doing." (*Id.*) Piccola testified,

> A. The Sphere, we were trying to get back on the MSG Sphere. You know,
> [Craig] was still there, she was still meeting with all of those people, I was
> hoping that—even if we were brought in as consultants just on the safety of
> the job, like, there was—there could have been a role for us, but we
> needed—the way that I introduced it, I introduced it as, you know, we would
> come over—I thought that all of us would come over together.
> Q. Come over where?
> A. To MSG. It never happened, it never happened, so.

(*Id.* at 123.) Piccola testified, "MSG said to me, You can come in as a consultant,"

but that Plaintiff thereafter notified MSG of Piccola's Non-Compete and MSG did not

"want to get involved in a lawsuit, so nothing ever happened." (*Id.* at 120.)

46. With respect to returning to the Sphere Project, Piccola testified further that

> I was hoping MSG would bring me on to help them through the complications
> of the project and to help them understand intent. Like I said, there was a
> million scope gaps on that job, because MSG as a company, as the
> construction manager, didn't understand intent. So I wasn't trying to get on
> the job to take any work away from them, I wasn't trying to get on the job to
> steal anything away, I was trying to get on the job to, again, support my
> family, but in a role that was completely removed from what I had been doing.
> It was to be—to, ultimately, function and get paid for the role that I had
> basically begun functioning in there.

(*Id.* at 147.)

47. On August 17, 2022, Plaintiff's counsel Mulvehill sent Piccola a letter demanding the

return of "any and all Company property . . . including, but not limited to, all

Company-issued computers, phones, and iPads." (Hr'g Ex. P-7.)

48. On September 1, 2022, Piccola received an email from "high-level management" at Plaintiff's customer and competitor, Chicago Flyhouse, with the subject line "[Redacted] application." (Hr'g Ex. P-4.) The email indicates that Piccola, Crain, and individuals at Chicago Flyhouse were attempting to coordinate a phone call. (*See Id.*) Piccola wrote that he would "like to include Adam Crain in the conversation" and copied Crain, at his Mountain Productions, Inc. email address, on one of his replies. (*Id.*)

49. Piccola testified that

there's a recruiter in the industry, his name is Dustin Collins, and . . . prior to being a recruiter in the industry, [he] worked for Chicago Flyhouse. . . . So when it became known to the industry that I'm on the outs with Mountain, it was Dustin, the recruiter, who connected me to these guys and said, Maybe you could step in in operations with them or maybe they could find a role for you there.

(Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 122.) Piccola stated that his communication with Chicago Flyhouse "ended at that phone call, it just never happened, never materialized." (*Id.*)

50. Rose also testified that on approximately October 3, 2022, Piccola "approached and put a bid in with Quince Imaging [Plaintiff's client], . . . and [Plaintiff] had put in a bid at the same time." (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 55.)

51. Piccola testified that Rose

lied when he said that I bid that job for Quince Imaging. I was forwarded the information on it, and I can't stop people from sending me things, . . . . But how am I going to bid it? He's lying. There's no way that I can bid those jobs. I

don't work for anybody, I don't have access to fabrication, I don't have access
to money. I don't have anything.

(Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 139.)

52. As of November 18, 2022, Piccola is pursuing a role at Live Events. (*Id.* at 134.) He
testified that working in that role would not breach the Agreement because Live
Events does work that "Mountain doesn't do." (*Id.* at 136.) He explained that Live
Events owns production companies that do "lighting," "sound," "video," "or all three or
pyro." (*Id.*) He also noted that his role would "have no forward-facing work, . . . no
customer work, [and] . . . no bidding work." (*Id.* at 134.) His job would be "creating
systems and processes for a safer environment within the Live Events family, as it
relates to rigging." (*Id.* at 136.)

53. Finally, Piccola directed his testimony to Plaintiff's counsel and stated,

The lawyers for Live Events don't want to touch me, as long as—unless they
receive a letter saying—and they issued you—we have that—I think they sent
you an email that clearly defined my role. If you agree to those terms of what
my role is, then, they'll take me on.

(*Id.* at 165.) Piccola testified that he "was told" such an email was sent to Plaintiff.

(*Id.* at 166.)

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction.[6] In ruling on a motion for a preliminary injunction, the Court must consider: "'(1) the likelihood that the moving party will succeed on the merits; (2) the extent to which the moving party will suffer irreparable harm without injunctive relief; (3) the extent to which the non-moving party will suffer irreparable harm if the injunction is issued; and (4) the public interest.'" *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 356-57 (3d Cir. 2007) (quoting *Shire U.S. Inc. v. Barr Labs. Inc.*, 329 F.3d 348, 352 (3d Cir. 2003)).

When requesting preliminary equitable relief, the movant "must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If these two "gateway factors" are met, a court should then consider the other two factors and determine "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

"District courts have the freedom to fashion preliminary equitable relief so long as they do so by 'exercising their sound discretion.' . . .  Indeed, '[t]he essence of equity

---

[6] The standard for granting a preliminary injunction under Rule 65 is the same as that for issuing a TRO. *Pileggi v. Aichele,* 843 F.Supp.2d 584, 592 (E.D. Pa. 2012) (citing *Bieros v. Nicola,* 857 F.Supp. 445, 446 (E.D. Pa. 1994)).

jurisdiction has been the power of the [court] to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it.'" *Reilly*, 858 F.3d at 178–79 (internal citations omitted).

### A. Likelihood of Success on the Merits

### 1. Breach of Contract

Plaintiff first argues that it is likely to succeed on the merits of its claim that Piccola breached the Agreement. (Doc. 5 at 7.)

In Pennsylvania, a breach of contract claim requires "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

The first element is met, because Piccola concedes that he is "bound by" the terms of the Agreement. (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 147.) Further, Piccola has not challenged any of the restrictive covenants as unreasonable or unenforceable. As a general matter, the Court agrees that most of the restrictive covenants—while certainly restrictive— are enforceable. Restrictive covenants are "not favored" due to their historical perception "as a trade restraint that prevents a former employee from earning a living." *PharMethod, Inc. v. Caserta*, 382 F. App'x 214, 219 (3d Cir. 2010). Such covenants are "closely scrutinized" because of "'the inherently unequal bargaining positions' of employer and employee, . . . and the significant hardship that can result when an employee is bound by

such an agreement." *Id.* at 219–20 (quoting *Reading Aviation Serv., Inc. v. Bertolet*, 454 Pa. 488, 311 A.2d 628, 630 (1973)) (citing *Morgan's Home Equip. Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838, 846 (1957)). Nonetheless, post-employment restrictive covenants are enforceable under Pennsylvania law if: "(1) they are incident to an employment relationship between the parties; (2) the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and (3) the restrictions imposed are reasonably limited in duration and geographic extent." *Id.* at 219 (citing *Sidco Paper Co. v. Aaron*, 465 Pa. 586, 351 A.2d 250, 252 (1976)).

Here, the Agreement is incident to Piccola's employment, and the temporal limitations (and geographical limitations with respect to the Non-Compete term) are within the bounds of those that courts have deemed reasonable in the past. First, "Pennsylvania courts routinely uphold one year restrictive covenants." *Nat'l Bus. Servs., Inc. v. Wright*, 2 F. Supp. 2d 701, 708 (E.D. Pa. 1998). Second, "[c]ourts have upheld non-compete covenants lacking geographic limits (or with very broad geographic restrictions) where the employee's duties and the employer's customers were geographically broad," as is the case here. *Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 476–77 (E.D. Pa. 2007) (collecting cases) ("If nationwide geographic scopes are reasonable for national companies, it is not hard to extrapolate that worldwide geographic scopes are similarly reasonable for worldwide companies.").

The Court takes issue only with the "Confidentiality" and "Ownership of Intellectual Property" clauses of the Agreement. Because

> restrictions imposed by the covenant [must be] reasonably necessary for the protection of the employer, . . . [w]hen a covenant imposes restrictions broader than necessary to protect the employer, a court of equity may 'blue pencil' the agreement by granting enforcement that is limited to those portions of the restrictions which are reasonably necessary for the protection of the employer.

*PharMethod, Inc.,* 382 F. App'x at 219 (citing *Sidco Paper Co.*, 351 A.2d at 254). The lists of types of information that the Confidentiality and Intellectual Property clauses purport to cover are both overbroad and vague, rendering them on the verge of unenforceable. *Id.* at 220 ("gratuitous over-breadth militates against any enforcement whatsoever"); (*see* Hr'g Ex. P-6 at 2). Thus, the Court will strictly construe these terms, and unless the information claimed to be confidential is reasonably susceptible to being identified as such, will not proceed with preliminary injunctive relief under these terms.

Lastly, the parties dispute whether Piccola breached the contract.[7] The Court will evaluate Piccola's performance under the key terms in turn.

**a. Non-Compete**

Plaintiff is not likely to succeed on its claim that Piccola breached the Non-Compete clause because it presented no evidence that Piccola has worked in *any* capacity since August 8, 2022, let alone for a "business . . . that is in competition with any products,

---

[7] The Court notes generally that, in its brief, Plaintiff devoted one sentence each to the breach of the relevant terms of the Agreement. (Doc. 5 at 14–15.) Piccola filed no brief. Therefore, the Court's analysis of breach is guided primarily by the arguments made by counsel at the November 18 hearing.

services or business activities" of Plaintiff. (*See* Hr'g Ex. P-6 at 4.) Plaintiff argues in its brief

that Piccola breached his Non-Compete "by, among other things, soliciting employment

from the Company's competitors including, but not limited to, Undisclosed Customers 1-4."

(Doc. 5 at 14.) But, setting aside whether Piccola actually solicited employment, the

Agreement plainly does not prohibit the attempted solicitation of employment with

competitors. The Non-Compete clause states, in pertinent part:

> During Employee's employment with Company and for a period ending twelve
> (12) months after the termination thereof, Employee shall not, directly or
> indirectly, as principal, owner, agent, employer, employee, manager,
> operator, consultant, shareholder or otherwise, **engage, control or be
> interested in any entity**, its successors, assigns, affiliates and related
> entities, within the "Territory" (as defined below), whether for profit or
> nonprofit, which is or are in any business or activity that is in competition with
> any products, services or business activities of the Company . . .

(Hr'g Ex. P-6 at 4 (emphasis added).) To breach this term would require more than

*attempting* to "engage, control or be interested in" a competing business—in other words, it

would require more than merely soliciting employment with a competitor.

At the hearing, Plaintiff also argued that Piccola competed with Plaintiff by submitting

a competing bid for a job with Quince Imaging. (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 55.)

Plaintiff offered no evidence of such a bid beyond Rose's testimony that he "learned that

[Piccola] put a bid in with Quince Imaging." (*Id.* at 54.) Piccola denied submitting a bid and

testified, "There's no way that I can bid those jobs. I don't work for anybody, I don't have

access to fabrication, I don't have access to money. I don't have anything." (Test. of Piccola,

Off. Hr'g Tr., Doc. 28, at 139.) The Court accepts Piccola's position that he did not submit

said bid for two reasons. First, Plaintiff has offered only Rose's second-hand knowledge as proof that Piccola submitted a bid on a Quince Imaging job. Second, accepting that Piccola has been unemployed since August 8, 2022, Piccola's position is inherently more credible because he lacked the resources and personnel to perform any jobs. Plaintiff's counsel argued,

> [Piccola]'s clearly trying to find alternative employment, and he can compete with us at those competitors. I don't know if he can bid or not, I'm not sure what the foundation of that is based upon, but he can certainly bid on some work. He walked off the job with riggers, he walked off the job with a large part of the management team from our organization.

(Off. Hr'g Tr., Doc. 28, at 171–72.) Notwithstanding the possibility that Piccola could bid on a job with other former employees of Plaintiff's, it is Plaintiff's burden to offer evidence that he did so.

Therefore, Plaintiff has not met its burden with respect to Piccola's alleged breach of the Non-Compete. Nonetheless, the Court emphasizes that its holding with respect to this term should not be read to suggest that the Non-Compete term is by any means unenforceable. Piccola remains prohibited from competing with Plaintiff as outlined in the Agreement, and were he to engage in such prohibited competition, such conduct would be enjoinable.

### b. Non-Solicit: Customers

Plaintiff argues that Piccola breached the Customer Non-Solicit clause "by, among other things, soliciting the Company's customers including, but not limited to, Undisclosed

Customers 1–4." The Non-Solicit clause provides in pertinent part that, for one year following Piccola's termination, he shall not

    i.      solicit or accept from any customer any orders for goods or services competitive to those provided or sold by Company . . .

    ii.     induce or attempt to induce any customer to reduce such customer's patronage with Company, by advertising to or solicitation of such customer; or

    iii.    otherwise interfere with the business or accounts of the Company or derogate or defame the Company.

(Hr'g Ex. P-6 at 5–6.) The hearing testimony touched on Piccola's alleged solicitation of three of its customers: Chicago Flyhouse, Bombard, and ArchKey.[8]

Plaintiff argues that Piccola solicited Chicago Flyhouse on the basis of an email chain between Piccola, Crain, and "high-level management at Chicago Flyhouse." (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 34–35.) Rose testified that on September 1, 2022, Piccola received an email from someone at Chicago Flyhouse with the subject line "[Redacted] application." (Id. at 35; See Hr'g Ex. P-4.) The rest of the email chain suggests that Piccola, Crain, and individuals at Chicago Flyhouse were trying to coordinate a phone call. (See Hr'g Ex. P-4.) At the hearing, Piccola explained that "when it became known to the industry" that he had left his job with Plaintiff, a recruiter "connected [him] to these guys and said, Maybe you could step in in operations with them or maybe they could find a role for you there."

_____

[8] Plaintiff argues that Piccola also solicited its customer Howard Hughes, but produced no evidence in support of that argument.

(Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 122.) Piccola testified further that "it ended at that phone call." (*Id.*)

This email chain, referencing a single phone call not initiated by Piccola, is insufficient to establish that Piccola "solicited" Chicago Flyhouse under the terms of the Agreement. Plaintiff's evidence and Piccola's testimony do not establish that Piccola actually "solicit[ed] . . . from [Chicago Flyhouse] any orders for [competitive] goods or services," nor that he "attempt[ed] to induce [Chicago Flyhouse] to reduce such customer's patronage" with Plaintiff, nor that he "otherwise interfere[d] with the business or accounts" of Plaintiff. (Hr'g Ex. P-6 at 5–6.) Thus, Plaintiff has not proven that Piccola solicited Chicago Flyhouse.

Plaintiff also argues that Piccola solicited ArchKey and "to some degree Bombard," (Off. Hr'g Tr., Doc. 28, at 169), two of Plaintiff's customers who were contractors on the Sphere Project. Goldenberg testified that Piccola told him that

> one way or another, with or without Mountain, he would be back on-site the following Monday, which indicated to me that he may have already reached out to our clients, our customers or others or was trying to do it on his own, with the help of the other people that were, maybe, off the site from Mountain, to come out, independently, from us, being Mountain Productions.

(Test. of Goldenberg, Off. Hr'g Tr., Doc. 28, at 93–94.) Piccola admitted that he "was hoping that [he] would . . . be re-employed on that project." (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 162.) He testified about his desire to "consult[] with MSG," the general contractor on the Sphere Project, but "not as it related to the work Mountain Productions was doing." (*Id.* at

140.) Piccola also testified that "MSG said to [him], You can come in as a consultant," but they subsequently learned of his Non-Compete "so nothing ever happened." (*Id.* at 120.)

Plaintiff also points to the screenshot of Piccola's text messages with Craig, in which Craig asks Piccola, "Have you spoken with Jason or Troy?". (Hr'g Ex. P-5.) Piccola does not appear to answer Craig's question. (*See id.*) According to Rose, "Jason" and "Troy" refer to customers of Plaintiff's; "Troy Bost was with ArchKey" and Jason was with "either Bombard or ArchKey." (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 44–45.) Piccola testified that Jason Rusalo[9] and Troy Bost are "very close friends" of his. (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 125.)

The Court finds that Plaintiff has not produced evidence that Piccola breached the Agreement by soliciting his services to ArchKey or Bombard, either. Craig's unanswered question to Piccola is insufficient to establish that Piccola solicited business from Bost or Rusalo at ArchKey or Bombard, and Piccola's testimony indicates that he sought to work for MSG, not for ArchKey or Bombard.

The Court is concerned, however, with Piccola's admitted attempt to return to the Sphere Project as a consultant for MSG. Piccola's testimony—"MSG said to me, You can come in as a consultant"—indicates that Piccola solicited his consulting services to MSG, and that a consulting agreement would have come to fruition but for MSG's awareness of

---

[9] Rusalo is spelled phonetically.

Piccola's Non-Compete. (*Id.* at 120.) While Plaintiff has not produced evidence to establish that MSG was its customer, the Court notes Piccola's testimony:

> I was hoping MSG would bring me on to help them through the complications of the project and to help them understand intent. . . . So I wasn't trying to get on the job to take any work away from [Plaintiff], I wasn't trying to get on the job to steal anything away, I was trying to get on the job to, again, support my family, but in a role that was completely removed from what I had been doing. It was to be—**to, ultimately, function and get paid for the role that I had basically begun functioning in there.**

(*Id.* at 147 (emphasis added).) Setting aside the technical functions of and relationships between contractors, subcontractors, and consultants, Piccola has effectively admitted that he sought to be compensated by MSG for the same role on the Sphere Project that he had "basically begun functioning in" while working for Plaintiff. (*Id.*) Such conduct violates, at least, the intent of the Agreement. And if Piccola's solicitation had been successful, his role as a consultant on the Sphere Project would have certainly involved the use of information, potentially confidential in nature, that Piccola learned while employed on the same job by Plaintiff. The Court therefore finds that Plaintiff is likely to succeed on the merits of its claim that Piccola breached the Non-Solicit clause as it pertains to customers.

### c. Non-Solicit: Employees

Plaintiff has also established a likelihood of success on the merits of its claim that Piccola violated the Non-Solicit clause of the Agreement with respect to Plaintiff's employees. The relevant clause provides that, for one year following the termination of his employment, Piccola

shall not, directly or indirectly, solicit or recruit any employee of Company ( or any of its subsidiary and affiliated companies) for any employment, consulting or other kind of work with Employee or any other entity, nor will Employee in any way encourage any such employee of Company, or any of its subsidiary :and affiliated companies, to leave his/her employment.

(Hr'g Ex. P-6 at 7.) Plaintiff argued in its brief that Piccola breached the Employee Non-Solicit clause "by, among other things, soliciting the Installs Division team working on the [Sphere] Project to walk-off the [Sphere] Project, [and] soliciting Craig to leave her employment with the Company as evidenced by the text message Piccola sent to Goldenberg." (Doc. 5 at 14.) At the hearing, Plaintiff pointed to Piccola's many references to "his team" as evidence that Piccola exercised control over the other employees who left their jobs with Plaintiff when Piccola did, and that he solicited them to leave their jobs. (*See, e.g.,* Hr'g Ex. P-2.)

First, Plaintiff has demonstrated that Piccola solicited its employees to "walk-off" the Sphere Project. It is undisputed that many of Plaintiff's employees did not show up to work on the Sphere Project on August 9, 2022, the day after Piccola's employment was terminated. (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 23–24.) Piccola suggests that the employees decided to quit on their own. For example, Piccola testified about his conversation with Crain on August 8: "[Crain] said, That fucking idiot Ricky is going to run the job? I said, Apparently. He said, Well, we're not going to work for him. I said, Man, that's your choice." (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 119.) At the hearing, counsel for Piccola argued generally that Piccola has had relationships with many of these employees,

including Crain, for over a decade, and that they walked off the Sphere Project "[o]ut of loyalty or out of their own personal will." (Off. Hr'g Tr., Doc. 28, at 176.)

The Court notes, as a threshold matter, Piccola's personal interest in testifying that his colleagues made independent decisions to leave their jobs with Plaintiff. (*See, e.g.,* Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 119.) To state otherwise would concede his breach of the Agreement. The Court considers his testimony with that interest in mind.

Furthermore, Piccola's conduct demonstrates an assumption that if he was leaving his job with Plaintiff, "his team" would leave, too. Piccola announced on LinkedIn on the day he left the Company, "**[M]y team** and I are [no] longer associated with Mountain Productions. . . . I will keep everyone posted on where **my team** and I plant ourselves next." (Hr'g Ex. P-2 (emphasis added).) Piccola's testimony suggests that he posted this before even notifying his Mountain Productions, Inc. colleagues—his "team"—of his departure from the Company. (*See* Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 118.) Piccola has not denied that his "team" refers to his colleagues in Plaintiff's Installations Department, with whom he has worked for 15 years, with the exception of Craig. (*Id.* at 115–16.) Goldenberg testified that Piccola suggested that his "team" would return to the Sphere Project if Piccola's stipulations were met. (Test. of Goldenberg, Off. Hr'g Tr., Doc. 28, at 92.) It is not difficult to infer from the testimony and Piccola's conduct that, at minimum, he encouraged Crain and other colleagues to walk-off the Sphere Project and pursue future work together as a "team," in violation of the Agreement.

Plaintiff has also produced sufficient evidence to establish that Piccola encouraged Craig to leave her job. Piccola's screenshot of his conversation with Craig depicts messages he sent to her, including, "Please help us put that final nail in the coffin today," and "A lot of lives are on hold Chris." (*See* Hr'g Ex. P-5.) Piccola explained the first message as follows: "[Craig] was still on-site, she was still talking to those people at MSG, help us get—if there's any way we can get back to work to support our families, help us do that." (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 143.) Piccola explained his message, "A lot of lives are on hold Chris" as follows:

> We were all waiting—we all were desperate to get back to work, like, we had—we were paying for places in Vegas to live and our homes back home, you know, we needed to get back to work, yeah. We were desperate, we were all desperate, and that was a conversation between—again, Chris Craig and I were very, very good friends.

(Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 124.) The Court finds that neither of Piccola's explanations contradict Plaintiff's contention that Piccola was soliciting Craig, at least by encouraging her to quit. When he asked Craig to "[p]lease help us put that final nail in the coffin today," the evidence suggests that Piccola was urging Craig to quit and thereby effect a partial or complete shutdown of the work on the Sphere Project, and Piccola has not offered an alternative explanation. In fact, his testimony suggests that Piccola hoped Craig would solicit MSG on behalf of Piccola and "his team," and not on behalf of Plaintiff, which necessarily involves quitting. Therefore, Plaintiff has met its burden with respect to Piccola's breach of the Non-Solicit of Employees clause.

### d. Confidentiality and Intellectual Property[10]

Plaintiff has established that Piccola breached the Confidentiality term of the Agreement by failing to return his Company-issued equipment. Plaintiff argues in its brief that Piccola breached the "Confidentiality Agreement by, among other things, disclosing the Company's Confidential Information and Intellectual Property to third-parties while soliciting work from the Company's customers and by failing to 'immediately deliver to Company all materials containing Confidential Information.'" (Doc. 5 at 14 (citing Rose Aff. ¶¶ 18, 83, Ex. J).)

Piccola concedes that he still possesses his Company-issued cell phone, iPad, and laptop. (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 126.) He retains this equipment despite Plaintiff's several demands for its return. (*See, e.g.,* Hr'g Ex. P-7.) The parties dispute, however, whether the equipment contains information covered by the "Confidentiality" clause of the Agreement. Rose testified that the equipment contains "[p]ricing models, customer lists, customer behavior, potential patents, designs, engineering drawings, all the things that give us a business advantage." (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 50.) Rose also stated that with respect to some pricing models, Piccola possessed the sole copy of the models. (*Id.*) Accordingly, Rose testified that Plaintiff has "been put in a position

---

[10] The Court analyzes these terms together because Plaintiff addresses them together in its brief, (Doc. 5), and because Plaintiff has offered no distinct argument as to the breach of the intellectual property term.

where we have had to work backwards to re-engineer the department to function, [which has] actually put us in some embarrassing situations with potential clients." (*Id.*)

Piccola testified generally that he does not believe the information he had access to was actually confidential. (*See id.* at 128–32.) He also testified that "[e]very single document was contained within a company . . . drop box folder" and that once his access to "the cloud" was cut off, he "was not able to access" Plaintiff's information. (*Id.* at 126.) Plaintiff's counsel countered that, notwithstanding Plaintiff's cloud-based storage system, documents can be stored "on [a] desktop or via folders and things of that nature. Simply being cut off from a drop box doesn't eliminate all confidential information." (Off. Hr'g Tr., Doc. 28, at 169–70.) Piccola testified that he had "zero" documents on his desktop. (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 148.)

The Court finds Piccola's testimony inherently contradictory with respect to which of Plaintiff's documents, if any, he retained on his devices. Piccola testified that he sent Craig a Rope Access Project Management Plan, depicted in the screenshot he sent to Goldenberg, and that he created that plan while employed by Plaintiff. (*Id.* at 144; Hr'g Ex. P-5.) To be sure, the Court finds Piccola's testimony credible with respect to the nature and contents of the document he texted to Craig. The title of the PDF in the screenshot aligns with Piccola's testimony. (*See* Hr'g Ex. P-5.) Nothing in the screenshot references the PDF as a "business plan," and the Court gives Piccola's personal knowledge more weight than Rose's second-hand information from Craig and Goldenberg's personal belief.

But Piccola's possession of the Rope Access Project Management Plan following his termination of employment with Plaintiff demonstrates that he retained at least that document of Plaintiff's on at least one of his devices. While the testimony does not reflect the date on which he sent the document to Craig, Piccola sent a screenshot of his conversation with Craig to Goldenberg "approximately[] a week" after Piccola left his job with Plaintiff. (Test. of Goldenberg, Off. Hr'g Tr., Doc. 28, at 148.) The screenshot indicates that Piccola sent the document to Craig the day before he took the screenshot of the conversation. (*See* Hr'g Ex. P-5 (showing the document titled "Rope Access Project Manag…" was sent "Yesterday 2:45 PM").) Absent evidence suggesting otherwise, the Court assumes Piccola took the screenshot and contemporaneously sent it to Goldenberg. Regardless of the exact timing, neither party has argued Piccola sent the document before August 9, 2022. Accordingly, Piccola has conceded that he continued to have access to the Rope Access Project Management Plan following his termination.

Further, Piccola's contention that Plaintiff's information he had access to was publicly available is contradicted by his own testimony. Piccola testified that when he sent the Rope Access Plan to Craig, he was "actually helping Mountain"—that "she asked for it, and I sent it to her. . . . To help her with her job." (*Id.* at 124.) If such information were publicly available, Craig would not need the specific plan that Piccola created while at the Company to complete the job. Therefore, the Court finds that Piccola retained a confidential "plan" as defined by the Agreement, used it outside of his "obligations in connection with his/her

relationship with" Plaintiff, and failed to "immediately deliver" all materials containing Confidential Information "[u]pon Company's request." (*See* Hr'g Ex. P-6 at 2.)

Because this particular document is identifiable and falls within the "plans" that are covered by the Confidentiality clause of the Agreement, Plaintiff has established a likelihood of success on its claim that Piccola breached that term.

### e. Non-Disparagement

Plaintiff is likely to succeed on the merits of its Non-Disparagement claim. The relevant clause of the Agreement states that Piccola

> agrees that [he] will not say, write or cause to be said or written, any negative, defamatory, derogatory or disparaging statement about the Company or any of its officers or employees or encourage or induce others to do so, **in any forum or setting, public or private**, by any means . . .

(Hr'g Ex. P-6 at 7 (emphasis added).) In its brief, Plaintiff alleges vaguely that Piccola breached the Non-Disparagement clause "by, among other things, disparaging the Company and its CEO." (Doc. 5 at 15.) At the hearing, Plaintiff pointed to several instances of alleged disparagement. Goldenberg testified that during his conversation with Piccola on August 9, 2022, Piccola referred to Ricky Rose as "that little shit." (Test. of Goldenberg, Off. Hr'g Tr., Doc. 28, at 93.) Piccola admitted making this statement. (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 154.) He also admitted making "similar comments" about Rose to Plaintiff's counsel. (*Id.*) He further admitted "talk[ing] poorly about [Rose's] leadership" to Marty Wesstrom. (*Id.* at 156.) When asked if he has "ever had any other negative conversations

about Ricky Rose with anyone else," Piccola initially said "no" but ultimately clarified, "I don't know, maybe. I said that he's a weirdo." (*Id.*)

Because the clause covers negative statements made "in any forum or setting, public or private," it covers the aforementioned comments Piccola admitted making to Goldenberg, Mulvehill, and Wesstrom. Therefore, Plaintiff has demonstrated a likelihood of success on the merits of its claim that Piccola breached this term of the Agreement.

## 2. Conversion

Plaintiff also asserts a claim for the conversion of its Confidential Information and Intellectual Property, along with its equipment containing said information. (Doc. 5 at 18.) Under Pennsylvania law, conversion is the deprivation of another's right in property without the owner's consent or lawful justification. *Sixth Angel Shepherd Rescue, Inc. v. Bengal*, 448 F. App'x 252, 254 (3d Cir. 2011) (citing *Prudential Ins. Co. of Am. v. Stella,* 994 F. Supp. 318, 323 (E.D. Pa. 1998)).

Having already established that Plaintiff is likely to succeed on the merits of its claim that Piccola has retained Company-issued equipment in violation of his Confidentiality Agreement, the Court need not duplicate its analysis here.[11] The Court adds only that the "evidence demonstrates that [Plaintiff] is the rightful owner" of the information and equipment, *id.* at 254, and Plaintiff is entitled to the return of said information and equipment

---

[11] As discussed *supra*, the Court finds that the Rope Access Project Management Plan is properly deemed "Confidential" under the Agreement and that Piccola retained said plan on at least one of his Company-issued devices.

both under the terms of the Agreement and under Policy 111 of Plaintiff's Employee Policy

Handbook. (Hr'g Ex. P-9 (providing for the return of all Company property upon termination

of employment.).) As Plaintiff has both demonstrated its demands for the return of the

equipment and solicited Piccola's admission that he retains the equipment despite those

demands, (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 126), Plaintiff is likely to succeed on

the merits of its conversion claim.

### 3. Misappropriation of Trade Secrets Under the Pennsylvania Uniform Trade Secrets Act ("PUTSA")

Lastly, Plaintiff asserts that it is likely to succeed on the merits of its claim under

PUTSA, (*see* Doc. 5 at 20), under which a court may enjoin the threatened or actual

misappropriation of a trade secret. *See* 12 Pa. C.S.A. § 5303. As a threshold matter,

Plaintiff bears the burden of proving the existence of a trade secret. *Iron Age Corp. v.*

*Dvorak*, 880 A.2d 657, 663 (Pa. Super. Ct. 2005). Under PUTSA, a trade secret is defined

as follows:

> Information, including a formula, drawing, pattern, compilation including a
> customer list, program, device, method, technique or process that:
> (1) Derives independent economic value, actual or potential, from not
> being generally known to, and not being readily ascertainable by
> proper means by, other persons who can obtain economic value
> from its disclosure or use.
> (2) Is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

12 Pa.C.S.A. § 5302. A trade secret does not need to be "technical in nature" to be fully protected by Pennsylvania law. *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 112 (3d Cir. 2010). Rather, a trade secret

> may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

*Rohm and Haas Co. v. Lin*, 992 A.2d 132, 143 (Pa. Super. Ct. 2010) (quoting *Tyson Metal Prods., Inc. v. McCann*, 546 A.2d 119 (Pa. Super. Ct. 1988)). To be considered a trade secret, the "information must be an employer's actual secret and not comprise mere 'general trade practices.'" *Iron Age Corp.*, 880 A.2d at 664. In other words, "in order to be protected, trade secrets must be the particular secrets of the complaining employer, not general secrets of the trade in which he is engaged." *Renee Beauty Salons, Inc. v. Blose-Venable*, 652 A.2d 1345, 1348-1349 (Pa. Super. Ct. 1995). A trade secret "does not include a worker's aptitude, skill, dexterity, or his manual and mental ability." *Iron Age Corp.*, 880 A.2d at 663.

In determining whether information is protected as a trade secret, Pennsylvania courts look to the following factors: (1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in that company's business; (3) the extent of measures taken by the

company to guard the secrecy of the information; (4) the value of the information to the company and to the company's competitors; (5) the amount of effort or money expended by the company in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Crum v. Bridgestone/Firestone North American Tire, LLC*, 907 A.2d 578, 585 (Pa. Super. Ct. 2006).[12]

The Court again incorporates its analysis of whether Piccola violated the "Confidentiality" term of the Agreement, *supra*. Thus, the Court starts with the findings that Picccola retained his Company-issued equipment after his termination, the equipment contained a Rope Access Project Management Plan, the plan was protected under the Agreement, the plan was not publicly available, and the plan was created by Piccola while employed by Plaintiff for the Sphere Project.

With respect to other potential trade secrets, Plaintiff presented little evidence with respect to the existence of specific information to be protected. Rose testified generally that Piccola had access to "trade secrets" and that Piccola's laptop contained confidential information including "[p]ricing models, customer lists, customer behavior, potential patents, designs, engineering drawings, all the things that give us a business advantage." (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 50, 61.) As discussed *supra*, Piccola testified that much of

---

[12] Although the PUTSA displaced Pennsylvania's common law tort for misappropriation of trade secrets, "there is no indication that the statute effected a substantive shift in the definition of 'trade secret.'" *Bimbo Bakeries*, 613 F.3d at 109 n.7 (3d Cir. 2010) (quoting *Youtie v. Macy's Retail Holding, Inc.,* 626 F.Supp.2d 511, 522 n. 10 (E.D.Pa. 2009)).

the information Plaintiff deems confidential he either created before joining Mountain Productions, Inc., or is actually widely known in the industry.

Considering the relevant factors and the limited evidence before it, the Court finds Plaintiff has met its burden of proving the following information constitutes trade secrets for purposes of preliminary injunctive relief: (1) the Rope Access Project Management Plan and any similar plans or designs that are not publicly available or easily duplicated, including "designs and drawings on past jobs" (*id.* at 51) and designs associated with "unique and custom solutions for jobs" that are developed through "in-house manufacturing and design capabilities that are not available to the general public or [Plaintiff's] competitors" (Rose Aff. ¶ 5); and (2) proprietary pricing models such as those that Rose testified Plaintiff has had to "work backwards to re-engineer." (Test. of Rose, Off. Hr'g Tr., Doc. 28, at 50.)[13]

The aforementioned are properly classified as trade secrets because, as specifically demonstrated, they are not generally known outside the Company. In addition, Plaintiff has made significant efforts to guard the secrecy of the information, through Employee Policy 610, (Hr'g Ex. P-8 (Confidentiality of Information)), and through restrictive covenants with certain employees, *e.g.*, the Agreement. The Court lacks sufficient information to find that Plaintiff's remaining alleged trade secrets are properly classified as such.

---

[13] The Court's identification of specific trade secrets should in no way be interpreted as a finding that Piccola is not bound by the terms of the Agreement or that Piccola should not comply with any contractual obligations that may exist pursuant to that Agreement.

Having found that Plaintiff has demonstrated the existence of trade secrets, the Court turns to the question of whether Piccola has actually misappropriated, or threatened to misappropriate, these trade secrets. *See* 12 Pa. C.S.A. § 5303. "A person has misappropriated a trade secret under Pennsylvania law when he acquires knowledge of another's trade secret in circumstances giving rise to a duty to maintain its confidentiality and then discloses or uses that trade secret without the other's consent." *Bimbo Bakeries USA, Inc.*, 613 F.3d at 110 (citing 12 Pa. C.S.A. § 5302). When determining whether to grant an injunction to prevent the threatened disclosure of a trade secret, the proper inquiry is "whether there is sufficient likelihood, or substantial threat" that the individual will use or disclose the trade secrets. *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1232 (Pa. Super. Ct. 1989).

As established *supra*, Piccola had a contractual duty to maintain the confidentiality of, at least, the Rope Access Project Management Plan. Piccola disclosed the plan without Plaintiff's consent, as the Agreement required Piccola to immediately deliver all Plaintiff's Confidential Information upon his termination. (Hr'g Ex. P-6 at 9.) As such, the Court finds that Piccola has already disclosed Plaintiff's trade secrets—by sending the Rope Access Project Management Plan to Craig—and the Court need not evaluate whether Piccola has also threatened to misappropriate trade secrets in the future.

Plaintiff has therefore demonstrated that it is likely to succeed on the merits of its claim that Piccola has misappropriated Plaintiff's trade secrets under PUTSA.

**B. The Extent to Which Plaintiff Will Suffer Irreparable Harm Without Injunctive Relief**

As stated *supra*, when requesting preliminary equitable relief, the movant "must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits . . . *and* that it is more likely than not to suffer irreparable harm in the absence of preliminary relief," *Reilly*, 858 F.3d at 179 (emphasis added). Irreparable harm "must be of a peculiar nature, so that compensation in money alone cannot atone for it." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) (citing *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987)). "[A]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-93 (3d Cir. 1992).

Here, with the exception of Piccola's alleged breach of the Non-Compete clause, Plaintiff has demonstrated that it can win on the merits of its claims. Plaintiff must also demonstrate that it is more likely than not to suffer irreparable harm in the absence of preliminary relief," *Reilly*, 858 F.3d at 179.

Plaintiff argues that it will suffer irreparable harm in several forms. First, "the Company has 'an interest in preserving customer relationships' and Confidential Information, both of which were 'intended to be protected by the non-compete agreement' and the non-solicitation agreements." (Doc. 5 at 16 (citing *Hillard v. Medtronic, Inc.*, 910 F. Supp. 173, 179 (M.D. Pa. 1995)).) Plaintiff also argues that the "Company has an interest in preserving employment relationships which were intended to be protected by the Employee

Non-Solicitation Agreement." (*Id.*) Further, Plaintiff asserts that it faces "the impending loss of a business opportunity or market advantage," which "may be aptly characterized" as irreparable harm. (*Id.* (citing *West Penn Specialty MSO, Inc. v. Nolan*, 737 A.2d 295, 299 (Sup. Ct. Pa. 1999)).) Plaintiff also notes the "potential loss of customers posed by Piccola's activities." (*Id.* (internal quotations omitted).) Finally, Plaintiff argues, the "'loss of [its] control of reputation, loss of [its] trade, and loss of [its] goodwill' constitute irreparable harm." (*Id.* at 20 (quoting *Pierre & Carlo, Inc. v. Premier Salons, Inc.*, 713 F. Supp. 2d 471, 481 (E.D. Pa. 2010)).)

The Court finds that Plaintiff has met its burden to demonstrate that it is likely to suffer irreparable harm if injunctive relief is denied. Plaintiff points to several potential harms—loss of employees, loss of customers, loss of control over confidential information, and damage to reputation—which justify preliminary injunctive relief. Compensation in money alone cannot atone for all of the damages that Plaintiff may suffer as a result of Piccola's conduct.

Any unlawful disclosure of Confidential Information or trade secrets may result in the loss of business opportunities or market advantage. The disclosure of such information undoubtedly puts Plaintiff at a competitive disadvantage vis-à-vis its competitors in the industry. This disadvantage is difficult, if not impossible, to quantify in terms of financial damages and is therefore incapable of being adequately remedied through the use of other

legal means. The damages caused by the loss of employees and customers, in whom Plaintiff has invested time and resources, is similarly immeasurable.

Moreover, Piccola acknowledged by signing the Agreement that his "failure to comply with the obligations of the Agreement **will irreparably harm the Company** and the Company's remedies at law for Employee's breach of the obligations of this Agreement will be inadequate, and Company shall be entitled to equitable relief, including without limitation injunctive relief." (Hr'g Ex. P-6 at 9 (emphasis added).) This term is not dispositive, but does "constitute evidence[] of such harm." *USA Techs., Inc. v. Tirpak*, No. CIV.A. 12-2399, 2012 WL 1889157, at *6 (E.D. Pa. May 24, 2012).

Accordingly, the Court finds that Plaintiff has demonstrated it is likely to suffer irreparable harm absent a preliminary injunction.

### C. The Extent to Which Piccola Will Suffer Irreparable Harm if the Injunction Is Issued

The Court must also consider the effect of an injunction on Piccola. "[E]ven a temporary injunction prohibiting someone from pursuing his livelihood in the manner he chooses operates as a severe restriction on him that a court should not impose lightly." *Bimbo Bakeries*, 613 F.3d at 119.

The Court acknowledges that the Temporary Restraining Order, (Doc. 16), has complicated Piccola's attempts to secure employment. Piccola credibly testifies that he had at least one job opportunity (with Live Events) fall through due to the TRO. (Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 164 (testifying that Live Events' "attorneys have said, until that

Restraining Order is released or defined more—less broadly, then, we can't have you come to work for us.") Piccola also notes that he has "no money" and has been "without a means to support [his] family, since August 8." (*Id.* at 120.)

Two points are worth clarifying here. First, the appropriate question at this stage is whether an injunction would irreparably harm Piccola, not whether the restrictions contained in the Agreement itself would. For that reason, any effect the Agreement standing alone has on Piccola's ability to secure employment is not relevant. The Court emphasizes that regardless of whether injunctive relief is ordered, the Agreement remains in full force and continues to impose restrictions on Piccola until its term expires.

Second, Plaintiff has not requested an order enjoining Piccola from working at Live Events. (*See* Doc. 4.) Importantly, the Court lacks sufficient information to determine whether or not Piccola would breach the Agreement by starting in that role. But Plaintiff has not asked for such relief, nor has it produced evidence to demonstrate that working in any particular role at Live Events would constitute a breach of the Agreement.

With these points in mind, the Court finds that the temporary injunctive relief requested would only minimally harm Piccola. The Court notes (without endorsing) Piccola's testimony that he believes his potential role at Live Events would not breach the Agreement, because it is an "operations job" that is not "forward-facing," it does not involve "bidding" or "customer work", and it does not "touch the professional sports market." (*See* Test. of Piccola, Off. Hr'g Tr., Doc. 28, at 134–36.) Piccola also testified that he had a previous

"profession" in "New Office Development" for a "large dental practice"—in a "completely different industry." (*Id.* at 103.)

Piccola's testimony suggests that, regardless of whether taking this particular Live Events job would violate the Agreement, there are potential jobs, in non-competing markets and in different roles than his former position with Plaintiff, for which he would be well-suited. Finally, the Court also acknowledges that, to ensure Piccola is able to successfully pursue those potential jobs, any preliminary injunctive relief must clearly define what he is enjoined from doing.

The Court finds that Piccola may work as a rigger as long as in doing so, he does not violate the Non-Compete, Non-Solicitation of Customers, Non-Solicitation of Employees, Confidentiality, Intellectual Property, and Non-Disparagement provisions of the Agreement, as well as the provisions of PUTSA. *See supra* at 39; *Iron Age Corp.*, 880 A.2d at 663 (A trade secret "does not include a worker's aptitude, skill, dexterity, or his manual and mental ability.").

### D. Public Interest

As a general matter, "there is a strong public interest in enforcing valid contracts." *USA Techs., Inc.*, 2012 WL 1889157, at *7. The Third Circuit has made clear that in a case such as this, it is not necessary for a district court "to engage in extended analysis of the public interest—extensive precedent supports an injunctive remedy where the elements of a trade secret claim are established." *SI Handling Sys. v. Heisley*, 753 F.2d 1244, 1265 (3d

Cir. 1985); *see also Bimbo Bakeries*, 613 F.3d at 119 (citing approvingly to this statement in

*SI Handling*). With respect to non-compete covenants in this context, courts have held that

> [t]he public interest is furthered by protecting legitimate business interests that are recognized under Pennsylvania law. The Court in *Sidco* stated that "[a]n employer's right to protect, by a covenant not to compete, interest in customer goodwill acquired by an employee is well established in Pennsylvania." 465 Pa. at 591, 351 A.2d 250. Such covenants provide an employer with a breathing spell in which to regain customer goodwill after the loss of an employee.

*Hillard*, 910 F. Supp. at 179. On the other hand, "there is a public interest in employers being

free to hire whom they please and in employees being free to work for whom they please,"

and "Pennsylvania courts consider the right of the employee to be more significant." *Bimbo

Bakeries*, 613 F.3d at 119.

Finally, with respect to non-disparagement clauses, "a knowing and intelligent waiver

of constitutional rights 'subsumes consideration of the public's interest.'" *USA Techs., Inc.*,

2012 WL 1889157, at *7 (quoting *Erie Telecomms. Inc. v. City of Erie,* 853 F.2d 1084, 1099

(3d Cir. 1988)).

Here, the general public interests in "enforcing valid contracts," *USA Techs., Inc.*, 2012

WL 1889157, at *7, "upholding the inviolability of trade secrets and enforceability of

confidentiality agreements," *Bimbo Bakeries USA, Inc. v. Botticella*, 2010 WL 571774, *16

(E.D. Pa. 2010), along with the "protection of legitimate business interests," *Hillard*, 910 F.

Supp. at 179, weigh in favor of granting Plaintiff limited injunctive relief. However, public

interest disfavors the risk of causing an employee significant economic harm and preventing

him from engaging in his chosen profession, as well as preventing an employer from hiring the person of its choice, which weighs against any injunctive relief barring Piccola from working for any period of time.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff has met its burden with respect to its entitlement to certain preliminary injunctive relief. Plaintiff has demonstrated that it has a likelihood of success on the merits with respect to its claim for breach of the Confidentiality, Non-Solicit: Customers, Non-Solicit: Employees, and Non-Disparagement clauses of the Agreement, as well as its conversion claim and its claim for the misappropriation of trade secrets under PUTSA. Plaintiff has also shown that it is more likely than not to suffer irreparable harm in the absence of some preliminary injunctive relief. On balance, these two factors, in conjunction with the extent to which Piccola would suffer irreparable harm and the public interest, balance in favor of granting limited preliminary injunctive relief to Plaintiff. Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 4) will therefore be granted in part and denied in part as set forth in this memorandum opinion.

A separate order follows.

Robert D. Mariani
United States District Judge